# In the United States Court of Federal Claims

No. 15-417L
(Filed: March 18, 2020)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| EYVONNE ANDREWS, et al., | Fifth Amendment Taking; Rails-to-Trails; Motion for Partial Summary Judgment; RCFC 56; Trails Act; Florida Law; Right-of-Way |
| *Plaintiffs,* | |
| v. | |
| THE UNITED STATES, | |
| *Defendant.* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Royce Deryl Edwards, Sr.*, Joplin, MO, for plaintiffs, with whom was *James F.B. Daniels*.

*Barbara M.R. Marvin*, who was at the time with the United States Department of Justice, Environment & Natural Resources Division, Washington, DC, with whom was *Jean E. Williams*, Deputy Assistant Attorney General.

## OPINION

BRUGGINK, *Judge.*

This is an action brought under the Tucker Act[1] for an alleged failure to pay just compensation owed under the Fifth Amendment. Plaintiffs are Florida landowners adjoining a railroad which has ended its operations. Plaintiffs allege that, but for the operation of the Trails Act,[2] the railroad

---

[1] The Tucker Act provides that the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2012).

[2] The Trails Act "preserve[s] shrinking rail trackage by converting unused rights-of-way to recreational trails" and is subject to the Fifth Amendment

would be deemed to have abandoned the track and their underlying fee interests would no longer be burdened by an easement. Pending before the court is defendant's April 26, 2019 motion for partial summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims and plaintiffs' June, 24, 2019 cross-motion for partial summary judgment on the issue of plaintiffs' cognizable and compensable property interests. Although styled as a motion for partial summary judgment, defendant's motion in fact seeks judgment in its favor with respect to all claims by all plaintiffs.

We held oral argument on October 1, 2019. Because issues raised during oral argument had not been addressed in the parties' briefing, we directed supplemental briefing. That briefing is now complete. As explained below, because plaintiffs lack a property interest in the land underlying the railroad, we grant defendant's motion and deny plaintiffs' cross-motion for partial summary judgment.

BACKGROUND[3]

This rails-to-trails case arises out of actions taken by the Surface Transportation Board ("STB"), an agency of the United States, that permitted the railroad CSX Transportation ("CSXT") to "abandon an approximately 11.62-mile rail line on CSXT's Southern Region, Jacksonville Division, . . . at High Springs in Alachua Country, Florida." Am. Compl. ¶¶ 1–2. CSXT is the successor in interest to the Live Oak, Tampa and Charlotte Railway ("LOTCHR"), which received transfers of interests in land from plaintiffs' predecessors in interest in the 1880's. The nature of those interests is at issue in the pending motions.

In 2014, and again in 2015, the STB issued a Notice of Interim Trail Use ("NITU"), as discussed below, which plaintiffs allege effected a taking of a new easement in their land without compensation in violation of the Fifth Amendment. Specifically, plaintiffs claim that Eyvonne Andrews, Michael and Belinda Robinson, A.O.C., LLC, Christine Kelly, John Boland and Gail Bisbee, and Ann Butler, Michael Thomas, Jr., and Mary Holmes, owned fee interests in real property located within Alachua County on which the abandoned railroad ran, and that the effect of the NITU was to forestall

---

Takings Clause. *Preseault v. I.C.C.* (*"Preseault I"*), 494 U.S. 1, 4 (1990).

[3] These facts are derived mainly from the Plaintiffs' Amended Complaint ("Am. Compl.") (ECF No. 22), Pls.' Statement of Uncontroverted Facts in Supp. of their Cross-Mot. for Partial Summ. J. ("Pls.' Facts") (ECF No. 66), and the accompanying exhibits.

plaintiffs' reversionary rights and to reimpose a new easement.[4]

Defendant's primary answer to the complaint is that CSXT's predecessor in interest purchased the land in fee in 1883 from Mary Shuford. Plaintiffs dispute that assertion. They argue, in the first instance, that the deed on which the government relies, as well as other subsequent, alternative deeds on which the government also relies, conveyed easements for a railroad purpose, and not a fee. In addition, they argue that, even if one or more of the deeds on which defendant relies granted a fee, the original railroad company, LOTCHR, did not legally exist at the time of acquisition; so those attempted transfers failed. Moreover, subsequent to the Shuford deed, the railroad commenced condemnation proceedings for the same property that it would appear it already owned in fee. Plaintiffs contend that this condemnation proceeding intervened between these attempted transfers, resulting in the railroad's acquisition of an easement.

After the condemnation proceeding, which seems not to have been finalized, there were two other deeds to the railroad (both of which defendant argues transferred a fee): one from Syntha C. Moore with respect to some of the land and another from George E. Foster for most of the balance. Defendant's alternative argument is that these deeds conveyed a fee to the railroad.

A.  Relevant Historical Facts

Defendant has presented a copy of LOTCHR's articles of incorporation, dated July 1, 1881. It also offers the court an excerpt from the official records of the Florida Secretary of State which reflects that on July 23, 1881, those articles were filed with the Secretary. We deal below with plaintiffs' challenges to the articles.

The next event offered by the parties occurred on July 5, 1883, when Mary Shuford, as grantor, "bargained sold conveyed and [q]uitclaimed . . . forever [a]ll [t]hat [c]ertain [t]ract or parcel of land" to LOTCHR "for and in consideration of the sum of five dollars" in what appears to be a typical deed in fee. Def.'s Mot. For Partial Summ. J., Ex. 1 (ECF No. 60-2). The land conveyed in the Shuford Deed encompasses all of the properties now owned by plaintiffs.

---

[4] Plaintiffs filed a stipulation for dismissal without prejudice of plaintiff Charles Reshard's (Heirs) claim pursuant to RCFC 41(a)(1)(A)(ii). Joint Stipulation for Dismissal Without Prejudice (ECF No. 75).

Shortly after the Shuford Deed was executed, on September 18, 1883, the directors of LOTCHR commenced a condemnation proceeding in the Fifth Judicial Circuit of the State of Florida, Alachua County, directed at land embraced within the Shuford deed. The government offers no explanation for why the proceeding would be necessary other than mistake. The condemnation petition alleges that LOTCHR was a company "legally incorporated . . . under the laws of the state of Florida", that "the above-named defendants," D.B. Dibble, Geo E. Foster and "Mrs. Shuford are claimants to and owners" of land which LOTCHR was seeking to condemn for railroad purposes. It also recites that the "Railway Company ha[d] not acquired titles to the right of way through the said described lands[.]" Pls.' Facts ¶ 2.[5]

Subsequently, on September 19, 1883, the court appointed three commissioners "to appraise the compensation to be made to the owners of the lands described in the petition[.]" Pls.' Facts ¶ 3. On December 12, 1883, the commissioners filed their appraisal, which was "recorded [on] December 24th, 1883 in Judgment Book D at pages 366 and 367." *Id.* ¶¶ 5–6. In this report, the commissioners stated they would "recommend that said petitioners do pay into the Register of [the] court the sum of seventy-six dollars as damages to said defendants for the right of way of said railway company[.]" *Id.* ¶ 7. The parties have been unable to find any proof that this condemnation proceeding resulted in an award. The parties dispute the effect of the appraisal petition and report, an issue addressed below.

Further confusing matters, a few months after the commissioners filed their appraisal report, on April 16, 1884, Syntha C. Moore "granted bargained sold alienated remised released conveyed and confirmed" a parcel of land to LOTCHR "for and in consideration of the sum of [t]wenty four [d]ollars[.]" Def.'s Mot. For Partial Summ. J., Ex. 2 (ECF No. 60-3). It is undisputed that the property conveyed in the Moore Deed includes some of the property conveyed to LOTCHR in the Shuford Deed. The parties have been unable to find a deed from Mrs. Shuford to Ms. Moore.

---

[5] In plaintiffs' recitation of facts, they assert that at some point in 1883, not specified, LOTCHR received authority from the Fifth Judicial Circuit Court of the State of Florida to file suits against Florida landowners seeking to condemn private property for railroad purposes, "including the action titled H.S. Haines ex rel. Live Oak, Tampa & Charlotte Harbor Railway Company, et al. v. C.B. Dibble, Geo E. Foster and Mary E. Shuford, Circuit Court for the 5th Judicial Circuit of Florida – Alachua Country, Bk. 1–D, p. 366-67." Pls.' Facts ¶ 1 (emphasis omitted).

Almost a year after the execution of the Moore Deed, on July 18, 1885, George E. Foster and his wife Florence A. Foster "granted bargained sold aliened remised released conveyed and confirmed" a tract or parcel of land to LOTCHR "for and in consideration of the sum of [s]eventy three 95/100 (73.95)." Def.'s Mot. For Partial Summ. J., Ex. 3 (ECF No. 60-4). The property conveyed in the Foster Deed includes that portion of the property conveyed to LOTCHR in the Shuford Deed which is now owned by Christine Kelly, John Boland and Gail Bisbee, and the Thomas Heirs. Once again, the parties are unable to trace a grant from Mrs. Shuford to the Fosters.

In sum, despite the parties' diligent efforts to provide a complete picture of the relevant deeds, condemnation proceedings, and incorporation documents, the result is a mare's nest of inconsistent documentation.

B.  Present Day Facts

On June 18, 2012, CSXT filed an "Environmental Report" with the STB pursuant to 49 CFR § 1105.6(e) and 1105.8(d) that announced its intention to file a "Petition of Exemption" for the purpose of abandoning the approximately 11.62-mile rail line. Subsequently, on November 20, 2013, CSXT filed a "Verified Notice of Exemption" with the STB, stating that the purpose of this action was "to abandon, discontinue service, salvage the track and improvements, and subsequently lease or sell the property." Pls.' Facts ¶¶ 16–17.

According to National Trails System Act (codified beginning at 16 U.S.C. § 1641 (2018)), the STB may convert unneeded railroad corridors to publicly-accessible trails. In other words, the "issuance of [a] NITU is the only governmental action in the rail banking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way. Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU." Am. Compl. ¶ 104 (quoting *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006)).

In a letter to the STB dated June 11, 2014, the Georgetown and High Line Railroad Company ("GHLRC") proposed to convert the railbed to trail use and requested the issuance of a NITU pursuant to 16 U.S.C. § 1247(d). The STB issued a NITU to GHLRC on July 15, 2014; however, the negotiating period expired on January 12, 2015, without a final agreement with CSXT regarding such conversion. Concurrently, on January 8, 2015, Alachua County, Florida, also requested issuance of a NITU, which ultimately issued to Alachua County from the STB on March 6, 2015.

At this time, Alachua County and CSXT have not reached a final interim trail use agreement. Plaintiffs allege, however, that the issuance of this NITU constitutes the imposition of a new easement. Thus, plaintiffs each seek monetary compensation from the United States for the Fifth Amendment "taking" of their respective property interests, pursuant to Section 8(d) of the NTSA, 16 U.S.C. § 1247(d).

Pending are the parties' cross motions for summary judgment. Plaintiffs argue that, at the time that LOTCHR purported to acquire rights in the railroad corridor, it did not exist as a valid Florida corporation and therefore acquired nothing. Plaintiffs argue, in the alternative, that LOTCHR acquired its rights in the railroad corridor through condemnation proceedings, which only resulted in easements and not a fee transfer, leaving plaintiffs with a legal right to unimpeded access to their land.

Defendant argues that the Shuford deed is sufficient to prove that LOTCHR acquired its interests in the portions of the corridor adjacent to plaintiffs' properties in fee, prior to the condemnation, and that sufficient proof exists that LOTCHR had corporate existence at the time. Alternatively, defendant argues that, if the Shuford deed is discounted, the condemnation was never completed and that the later Moore and Foster deeds conveyed fee simple title to LOTCHR, leaving plaintiffs no rights in the land.

DISCUSSION

A. The Trails Act and Fifth Amendment Takings Clause

The Trails Act "preserve[s] shrinking rail trackage by converting unused rights-of-way to recreational trails" and is subject to the Fifth Amendment Takings Clause. *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 4 (1990) ("*Preseault I*"). If the government takes private property pursuant to the Trails Act, the government must provide just compensation. *Id.* In a rails-to-trails takings case, a "taking occurs when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use [i.e. a NITU]." *Caldwell v. Untied States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004) (citations omitted). In other words, when "the railroad and prospective trail operator reach an agreement, . . . the STB retains jurisdiction for possible future railroad use and the abandonment of the corridor is blocked even though the conditions for abandonment are otherwise met." *Id.* at 1229 (internal quotations and citations omitted). Thus, "the Trails Act prevents the operation of state laws that would otherwise come into effect upon

6

abandonment." *Id.*

The Federal Circuit has explained that a rails-to-trails takings claim presents three determining questions:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

*Preseault v. United States* 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("*Preseault II*"). In the present case, for reasons we discuss below, we need not move beyond the first inquiry.

The court analyzes property rights of the parties in rails-to-trails cases under the relevant state law, in this case, Florida. *Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015) (citing *Preseault II*, 100 F.3d at 1543). Under Florida law, the "language of the deed determines the nature of the estate conveyed." *Rogers v. United States*, 184 So.3d 1087, 1097 (Fla. 2015) ("*Rogers II*"). Moreover, the Florida Supreme Court has stated the following well-established rule:

> [w]hen the language of a deed is clear and certain in meaning and the grantor's intention is reflected by the language employed, there is no room for judicial construction of the language nor interpretation of the words used . . . If there is no ambiguity in the language employed then the intention of the grantor must be ascertained from that language.

*Id.* at 1095. If the language of the deed is not clear, a court should "consider the language of the entire instrument in order to discover the intent of the grantor, both as to the character of estate and the property attempted to be conveyed, and to so construe the instrument as, if possible, to effectuate such intent." *Castillo v. United States*, 138 Fed. Cl. 707, 732 (2018) (quoting *Reid v. Barry*, 112 So. 846, 863 (Fla. 1927)).

This court has found, under Florida law, that "[a] deed which contains

restrictions on land use or reversionary clauses 'suggests an intent to create an easement or convey something less than a fee estate.'" *Id.* (quoting *Rogers v. United States*, 107 Fed. Cl. 387, 396 (2012)). "Conversely, an instrument that lacks any restrictive or reversionary clauses, but instead has expansive granting clauses, granting all right, interest and title suggests that the grantor intended to grant title to the grantee." *Id.* (citations omitted). Moreover, "[i]f a railroad owns in fee simple the land underlying and immediately surrounding a railroad right of way at the time of the alleged taking, another party cannot be owed just compensation for the taking of that land." *Whispell Foreign Cars, Inc. v. United States*, 97 Fed. Cl. 324, 330 (2011).

B. The Shuford Deed and the Condemnation Proceeding

The Shuford deed is critical to the entire case because it is first in time and, as the parties agree, whatever interest LOCHTR obtained in 1883 from Mrs. Shuford is comprehensive of all the plaintiffs. The two subsequent deeds are not. Defendant created the following chart for reference:

| Conveyance to LOTCHR | Corresponding Property Owners and Parcel Numbers |
|---|---|
| **Shuford Deed** | Eyvonne Andrews |
| | Michael and Belinda Robinson |
| | Charlie Reshard |
| | AOC LLC |
| | Christine Kelly |
| | John Boland and Gail Bisbee |
| | The Thomas Heirs (Ann Butler, Michael Thomas, Jr., and Mary Holmes) |
| **Moore Deed** | AOC LLC |
| **Foster Deed** | Christine Kelly |
| | John Boland and Gail Bisbee |
| | The Thomas Heirs (Ann Butler, Michael Thomas, Jr., and Mary Holmes) |

Def.'s Mot. For Partial Summ. J. at 7 (ECF No. 60).

The Shuford Deed recites that on July 5, 1883, Mary E. Shuford, the grantor, "for and in consideration of the sum of five dollars" paid by LOTCHR,

> has bargained sold conveyed and Quitclaimed and by these presents does bargain sell convey and quit claim unto [LOTCHR] . . . forever All That Certain Tract or parcel of land 200 feet in width one hundred feet on each side of the center line of the road bed of the Live Oak and Charlotte Harbor Railway extending through the following lands . . .

> NW 1/4 & SE 1/4 of sec. thirty-three (33) in Township seven (7) south and Range seventeen (17) East and SW 1/4 of Section thirty-four (34) Township seven (7) South and Range Seventeen (17) East & NE 1/4 of Section Three (3) and NW 1/4 of Section two (2) Township Eight (8) south and Range Seventeen (17) East.

> Together with all and singular the tenements hereditaments and appurtenances thereunto belonging or in anywise appertaining and the reversion and reversions remainder and remainders rents issues and profits thereof and also all the estate right title interest property possession claim and demand whatsoever . . . .

> To have and to hold . . . the above mentioned and described premises together with the appurtenances . . . forever.

Def.'s Mot. For Partial Summ. J., Ex. 1, (ECF No. 60-2). The deed refers to a parcel of land, not a right of way. The right given is "[t]o [h]ave and to hold . . . forever;" there is no limiting language, nor are there any reversionary interests. There can be no reasonable argument that this conveys something other than a fee. Indeed plaintiffs do not seriously contend otherwise.

Instead they argue that, since LOTCHR filed a petition for condemnation against Mrs. Shuford after the date of the Shuford Deed, wherein it declared it had not acquired title to the right of way though her property, that LOTCHR acquired title to the property by condemnation and that it therefore only obtained easements. Plaintiffs conclude that LOTCHR sought condemnation because it believed it had no title or a defective title to Mrs. Shuford's property, although no evidence of either belief is offered. They also rely on Florida law creating a presumption that railroad condemnations result in easements for railroad purposes, not fee estates.

The Government admits that a petition in condemnation was initiated by LOTCHR and that a report of appraisal was recorded. What is missing is evidence that LOTCHR ever paid the amount that the commissioners recommended as compensation.

There is no question that the state of the title record of this property is perplexing, to put it mildly. However, the earliest transfer we can establish with certainty is the Shuford deed, which clearly sold a fee estate to LOCHTR with respect to all the relevant land. In this respect it is helpful to the government that we are not confronted with clear proof that the condemnation was effectuated, but this is not determinative. It goes without saying that land can only be legally transferred once by the grantor. Every subsequent conveyance was a nullity. The same was true of the Moore and Foster deeds. They could not give what they did not have. It is therefore unnecessary to accommodate the condemnation proceedings or parse the language of the Moore and Foster deeds. If the railroad could take property, then the Shuford deed was effective thereafter.

C. LOTCHR's Corporate Existence

In plaintiffs' amended complaint, they recite that LOTCHR "was incorporated under the general laws of Florida on July 23, 1881." Am. Compl. ¶ 23. Despite that admission, in briefing the cross motions for summary judgment, plaintiffs assert that LOTCHR had no juristic existence as a corporation due to its failure to satisfy the statutory requirements to operate as a Florida railroad corporation, and that it therefore could not acquire anything in the way of easements or fee interests.

Plaintiffs cite to Chapter 1987 of the Act of the Florida Legislature of February 19, 1874 for the proposition that, at the time when LOTCHR acquired rights in the railroad corridor, in order to "take and hold" or "to purchase and use" real estate, LOTCHR must have filed articles of association or an affidavit with the Florida Secretary of State. Pls.' Supp. Mem. in Opposition to Def.'s Mot. for Partial Summ. J. at 12 (ECF No. 84)

In its summary judgment briefing, defendant attached a copy of articles of association[6] for LOTCHR which were dated July 23, 1881. A

---

[6] Defendant filed a substitute Ex. A on August 2, 2019, including the copy of articles of association and a certification from Amy L. Johnson of the Florida Department of State certifying "that records of the Live Oak, Tampa and Charlotte Harbor Railroad Company were transferred to the custody of

Report of the Florida Secretary of State for activities between January 1[7], 1881 through December 31, 1882, reflects that the articles of association for LOTCHR were filed with the Secretary of State's office.[8] *Id.*

Plaintiffs are not persuaded, however, because they obtained a certificate from the current Florida Secretary of State to the effect that "the records of this office do not disclose a corporation by the name of LIVE OAK, TAMPA, AND CHARLOTTE HARBOR RAILWAY COMPANY, foreign or domestic, active or dissolved." Pls.' Ex. 28.

Finally, plaintiffs argue that nothing in the report of the Florida Secretary of State for 1881-82 proves that a "certificate" or "letters parent" were ever issued to LOTCHR, which plaintiffs contend were typically received after a railroad filed its Articles. Without a certificate under the great seal of the state of Florida signed and countersigned by the Secretary of State and the Governor, we have no proof that the railroad was actually duly incorporated in Florida, according to plaintiff.

In sum, what we have by way of affirmative direct proof of the existence of LOCHTR, is a certified copy of the railroad's articles of association, a report verifying that LOTCHR's articles of association were filed in the Secretary of State's office, and plaintiffs' earlier concession in their amended complaint that LOTCHR was incorporated under the general laws of Florida. What is missing is a certificate or letters patent from the State of Florida stating that letters of incorporation were issued to the railroad.[9]

---

the State Archives of Florida." Ms. Johnson is the official custodian of those records. Def.'s Notice of Filing Substitute Ex. 1 (ECF. No. 72).

[7] We deem frivolous plaintiffs argument that this statement is objectively false because the Florida Senate was not in session on January 1, 1883, rather it was called to order only on January 2.

[8] Defendant filed a notice of errata on August 29, 2019, providing notice of a citation error in its Opposition to Pls.' Cross-Mot. for Partial Summ. J., filed on July 25, 2019, (ECF No. 71). We also deem frivolous plaintiffs' objection to this notice of September 9, 2019, in which they argue, among other things, that the purported "Exhibit A" was not accompanied by any declaration or certificate of authentication, that the government's attempt to add to the summary judgment record was untimely, and that it fails to show that LOTCHR ever received a charter from the State of Florida. Pls.' Resp. and Objection to Def.'s Notice of Errata Filed 8/29/19 [Doc. 76] (ECF No. 77).

[9] We view as not determinative in this respect the certification plaintiffs obtained from the Florida Secretary of State that no records of such a

We also, however, have indirect proof of the railroad's corporate existence. For instance, the condemnation proceedings were instituted in the Fifth Judicial Circuit of the State of Florida in the name of the directors of LOTCHR , who alleged that LOTCHR was a company "legally incorporated . . . under the laws of the state of Florida." And plaintiffs themselves recite that at some point in 1883, LOTCHR received authority from the Fifth Judicial Circuit Court of the State of Florida to file suits against Florida landowners seeking to condemn private property for railroad purposes. *See* note 5, *supra.*

The court's own search of Florida's Reports of the Secretary of State for the years 1883-84 discloses additional indirect proof of the corporation's existence. [10] On March 12, 1884, there was recorded the change of the name of LOCHTR to the "Savannah, Florida and Western Railway Company ("Savannah Railway")." On May 16, 1884, a "certificate" for the "Live Oak, Tampa and Charlotte Harbor Railway Company" was recorded for "Lake City Branch." On May 28, 1884, an "Original Certificate of Consolidation" was filed for the Savannah Railway and several other railroads, including LOCHTR. We will not undertake to harmonize these latter seemingly inconsistent documents. They are probably a reflection of what plaintiffs document in their initial brief of the wild west conditions in Florida in the 1880's when land speculators and competing railroads were buying land and laying track with abandon and no doubt little concern about a foolish consistency. We do not insert them for comic relief, however. They are further indication that there was a railroad company operating in central Florida under the name LOCHTR with the apparent approval of state government.

Even if plaintiffs are correct that failure to produce evidence of a "certificate" or "letters patent" for LOTCHR draws into question the legal existence of the corporation at that time, we nonetheless believe that LOTCHR met the elements required for a "de facto corporation," which, at that time included (1) a law or charter authorizing such a corporation, (2) an

corporation could be located. Either the Secretary's search merely confirms that no letters of patent incorporation were issued, or the search failed to disclose what we know did exist: articles of incorporation, filed with the Secretary of State.

[10] The court takes judicial notice of such public records. Report of the Secretary of State for the Years 1883-84, available at http://archive.flsenate.gov/data/Historical/Senate%20Journals/1880s/1885/Other%20stuff/12-secretary_1883-84.pdf.

attempt in good faith to comply with the law authorizing its incorporation, (3) unintentional omission of essential requirements of the law and charter, and (4) exercise in good faith of corporate functions under the law or charter. *Richmond v. Town of Largo*, 19 S. 2d 791, 793 (Fla. 1944). A somewhat less lofty test was set out in *Duke v. Taylor*, 19 So. 172 (Fla. 1896), where the Florida Supreme Court stated that a "corporation is a de facto corporation where there is a law authorizing such corporations, and where the company has made an effort to organize under that law, and is transacting business in a corporate name." *Id.* at 176.

We find that LOTCHR demonstrated sufficient compliance with Chapter 1987 by filing its articles of association for incorporation, officially recording some of its corporate actions, and by conducting business in its corporate name.[11] Requiring more proof than this nearly 140 years later is unrealistic. The effect of that finding is that there is no impediment to the Shuford conveyance to LOTCHR because a *de facto* corporation could convey and receive title under Florida law. *See Booske v. Gulf Ice Co.*, 5 So. 247, 251-52 (Fla. 1888) ("It is settled that a conveyance by a corporation will not be treated as invalid merely because the corporation was not formed under authority of law, and the same rule applies to transfers of personal property and choses in actions by corporations *de facto*."). We thus find that the transfer to LOTCHR is not void and that the railroad obtained a fee from Mrs. Shuford.

## CONCLUSION

Because the first recorded conveyance was effective to transfer a fee interest to the railroad and is determinative of all of the properties now at issue, we grant defendant's motion for summary judgment (ECF No. 60) and deny plaintiffs' cross-motion for partial summary judgment (ECF No. 64). The clerk is directed to dismiss the complaint and enter judgment for defendant. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[11] Plaintiffs argue that Florida appears to have abrogated the doctrine of "de facto incorporation" decades ago. Even if Florida has abandoned this doctrine, however, it was place during the events that matter.